UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                CASE. NO.  23-20438

        Plaintiff,

v.                               HON. MATTHEW J. LEITMAN

MOHAMED ALI,

        Defendant.

_____/

## MOHAMED ALI'S SENTENCING MEMORANDUM

Anyone who has had a night with too much to drink knows some version of the feeling: one wakes up the next day with a lump in their throat, obsessing over every stupid decision they made that night. *Did I really say that? Did I really do that?* Roughly three years ago, Mohamed Ali got very drunk before a flight and became totally unruly, disrupting the flight attendants and forcing those on the flight to keep him restrained until the plane landed. For that, Mohamed awoke to a jail cell filled with horror, shame, and remorse. He was promptly charged with a misdemeanor assault in federal court. He appeared as required and immediately accepted responsibility to a ticket for assault, paid the costs associated with the sentence, and did his best to grow from the experience. Over a year later, Mohamed was separately charged with this offense, felony interference with attendant duties, for which he also accepts full responsibility. In the

1

meantime, Mohamed has dealt with this case out of custody, being out on bond without issue, and proving that he is no danger to the community. And his chronic kidney disease warrants serious concern about the prospect of a federal prison sentence. Proving that any sentence beyond probation is unnecessary, and without objection from the Government, Mohamed asks you to consider the § 3553(a) factors and find that a probated sentence is sufficient and not more than necessary.

## I.    The Law

In reaching this decision, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence, as explained by the District Court in *United States Faison*, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020) (Hazel,J.):

> During the sentencing hearing, the lawyers and the judges discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory.   Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him.  For him, every day, month, and year that was added to the ultimate sentence will matter.  The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family.  Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence.  Liberty is the norm; every moment of incarceration should be justified.

## II.   The 3553(a) factors favor a probated sentence in this case
### a. Mohamed Ali's upbringing and personal characteristics favor probation



*Ali, second to right, with family.*

Mohamed Ali was born in Ibb, Yemen to Mahyob Ali and Amirih Albnan in 1987. His father was an entrepreneur that frequently traveled to and from the United States. When Ali was still young, his father opened a grocery store in New York, opening the door for Ali to come to live in the United States. In 1998, when Ali was just 11 years old, he became a naturalized citizen of the United States.   Ali came to the United States for the first time four years later, with his family settling in the Bronx. He is one of 22 siblings, only some of whom came to live with him in the United States to live with his father. He has three siblings in particular that he is close with.

When in the United States, he lived alone with his father, as his mother remained at the home in Yemen. His father was "rough." He would hit Ali and the others. And

3

his father had little issue with Ali dropping out of school so that he could work for the family business. Tensions between Ali and his father would only mount because Ali could not subscribe to the same deeply religious beliefs that his father tried to impart on him.

 Since about 10th grade, Ali has been working with his family or other family members in their family-owned grocery stores. He has worked every job, including as the operator. He currently works with his brother at a family-owned grocery store in North Carolina, where he has been residing for years.



*Ali, left, and his brother at one of their stores.*

Ali is the proud father of two, Radan and Raad. Both live in Yemen with their mother, Ali's ex-wife. The two split during the pandemic as a result of financial stress. The divorce became a constant source of depression for Ali, who wanted to make things work. Still, he financially supports his children, speaks to them regularly, and is planning

for them to come to the United States and attend school here in the near future. Those plans to have them live with him have been upended by his charges in this case, which Ali deeply regrets. He is determined to remain out of custody so that he can solidify plans to quickly reunite with his children and provide them the same opportunity for life in the United States that his parents gave to him.

Notably, Ali has sought treatment for the depression he has struggled with because of his upbringing and divorce. In August of this year, he voluntarily sought treatment with Best Day Psychiatry and Counseling in Greenville, North Carolina, as noted in the presentence report.



*Ali and his kids.*

The counseling is designed in part to address his abuse of alcohol. He started drinking beer around 2022, as a result of his struggle with the divorce. And he understands that his abuse of alcohol on the day of the incident directly led to his

behavior. To tackle the alcohol abuse directly, Ali has voluntarily signed up for alcohol abuse treatment with the Mills Treatment Services in Wilson, NC. (Ex. B, Letter from Mills). He performed his assessment on October 15, 2025, and as of November 9, 2025, he had completed eight of his twenty scheduled hours of individual and group sessions. The treatment program focuses on the twelve step programs, coping skills, and about understanding the impact that addiction has on the family. Mohamed is now committed to sobriety for the betterment of himself and his family. He continues to participate in the weekly program and is scheduled to complete the program in April of this year.

### b.  Mohamed's health warrants serious consideration

Ali is seriously and chronically ill and is better served by being out in the community where he can continue to receive regular treatment from his regular treating physician.

Mr. Ali suffers from Stage 4 chronic kidney disease and has been suffering from the disease for over 10 years. (Ex. A, Letter from Physician) chronic kidney disease is a condition where the kidneys are damaged and cannot filter blood properly, resulting in excess waste building up in the blood. The excess waste leads to serious secondary health problems, such as an increased risk for heart attack or stroke. There is no cure

for chronic kidney disease, and the life expectancy for a 40-year-old with chronic kidney disease, at his current stage of disease, is just 16.3 years.[1]

The above-referenced secondary symptoms are a reality for Ali. In the same letter from his physician, his doctor notes that Ali suffers from "chronic gout due to renal impairment involving to[e] of right foot" and "hypertension secondary to other renal disorders." Ex. A.

He will eventually require daily dialysis in order to keep his blood properly filtered, and right now requires constant observation by his treating physician to manage his care. His treating physician has written a letter in support of Ali, confirming his diagnosis, prognosis, and warning, "Kidney function is expected to decline and will at some point most likely need dialysis but unfortunately, I cannot predict when dialysis will be needed. At his low stage I would assume in the next 6 months - 2 years but that is my best educated guess." That letter was in December of 2024, and the prognosis has not changed since then. Ali reports as of January 2026, he expects to start dialysis within the next six months.

There is little telling how Mr. Ali would fare if subjected to custody in the Bureau of Prisons ("BOP"), and whether his required management for his conditions would continue without difficulty. What the Court can be sure of is that, as of that as of recent,

---

[1] Guy H Neild, Life expectancy with chronic kidney disease: an educational review, NIH, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5203814/ (Last accessed on December 9, 2024).

the BOP faces significant challenges to funding and staff that raise serious concerns generally about their ability to care for high-need medical conditions like the ones Ali suffers from. For years, the BOP has blamed its challenges on chronic agencywide staffing. In 2023, 16% of correction officer jobs were vacant and "prison health services jobs sat similarly unfilled."[2] Despite a push in 2024 for increased staff, the most recent administration implemented a number of cost-cutting measures related to medical treatment, including cutting 80 psychology doctoral internships.[3] As a result of the overpopulation of BOP facilities as of recent, there are widespread stories of detainees at BOP facilities receiving moldy food and having no access to medical treatment.[4] One detainee recently recounted that she:

> had struggled for a year to access healthcare at the facility and had never seen an eye doctor, dentist or psychiatrist. The medical challenges have become worse as the population has swelled, she said: "There are some good officials who are more humane and try to help us but they're overwhelmed. When they call medical [staff] for help, they're told it's not an emergency, so we don't have time."[5]

This is the environment Ali faces if sentenced to incarceration at a BOP facility.

### c. The nature of the crime, while serious, does have mitigating

---

[2] Katie Rose Quandt, "How Trump's Policies Are Making the Lives of Incarcerated People Even Worse," Solitary Watch, https://solitarywatch.org/2025/07/21/how-trumps-policies-are-making-federal-prisons-even-worse/ (Last accessed on January 9, 2026)
[3] Id.
[4] Sam Levin, "Moldy food, used underwear: inside the US prisons where Trump is jailing immigrants," The Guardian, available at https://www.theguardian.com/us-news/2025/may/01/trump-immigrants-federal-prisons (Last accessed on January 9, 2026)
[5] Id.

**circumstances**

On April 3, 2023, Mr. Ali was headed to Detroit via La Guardia International Airport to visit his sister. Unexpectedly, Ali's flight was delayed. Frustrated, Mr. Ali went to the local airport bar as he waited for his flight to board. He believes he had about four glasses of wine. By the time he was boarding, Mr. Ali was drunk. Upon boarding, he began acting disorderly. The flight attendants addressed his behavior with him before takeoff and, believing that Ali was capable of making the flight, they cleared the plane for takeoff.

Unfortunately, Ali's behavior resumed once the plane was in the air. Ali is embarrassed to admit that he has no recollection of what occurred. He accepts the witness' version of events, which is that Ali was rude and aggressive and belligerent. Eventually, Ali was required to be restrained and monitored for most of the flight to Detroit. Upon landing, Ali was promptly arrested and spent overnight in custody until he had sobered up. He was released the next morning.

Ali was promptly ticketed with simple assault, 18 U.S.C. § 113(a)(5), on April 4, 2023, and he appeared in federal court in Detroit for ticket duty court on or around May 3, 2023, to resolve that matter (Ex. C, Ticket, Redacted). He had retained counsel. Ali timely pled guilty and was issued a fine of $750. He promptly paid the fine as instructed on June 20, 2023. (Ex. D, Screenshot of Payment).

After paying the fine, as ordered, Mr. Ali went back to living an otherwise law-abiding life. He has no other criminal history whatsoever, and this was his very first interaction with the criminal justice system.

Mr. Ali believed that the case had been resolved until June 3, 2024, over a year later, when an indictment was unsealed with an arrest warrant for Mr. Ali for felony "Interference with Flight Crew Members and Attendants," pursuant 49 U.S.C. § 46504. He has since appeared for his arraignment, plea, and is in compliance with all his bond conditions since being placed on bond in June of 2024. Since his placement on bond, he has had no pretrial violations. Not one. By the time of sentencing, Ali will have been on bond with without issue for over a year and a half. And it will have been nearly three years since the incident occurred, without any other criminal history or struggles living in the community.

### d. Ali is not a danger to the community, and the public is protected by a probated sentence.

Ali's lack of criminal history and the events following the offense conduct show that Ali is no danger to the community, and that the public is protected even with a probated sentence.

**Criminal history.** If there was ever a case where the term "aberrant behavior" might be appropriate, this might be it. Ali has never been in any legal trouble before this incident. He has no juvenile adjudications. He does not have so much as a traffic offense to his name. He does not have any history of inappropriate or violent conduct.

10

No history of assaultive behavior. No abuse of any illegal controlled substances prior to the circumstances of this case. This is his first interaction with the criminal legal system, and it will be his last. Ali is sure of that.

The events following Ali's initial arrest show that he is no danger to the public. Ali was initially arrested on April 4, 2023. He was issued a ticket and asked to appear in federal court. He did so in May of 2023 and promptly accepted responsibility. He paid the fine as directed. Since then, and as before, Ali has had no trouble with the law.

The Government made a decision not to charge Ali with a felony for over a year. It is not unreasonable to suggest that the Government would have charged Ali more promptly if they thought he was any sort of immediate threat to the public. Upon charging him, they likewise did not seek detention, instead raising no objection to a bond. And true to his bond, Ali has had not a single pretrial violation despite being on bond for over a year and a half. All of these facts show that the public is already protected by a probated sentence.

### e. Even a probation sentence serves as just punishment and reflects the seriousness of the offense.

A probated sentence reflects the just punishment when considering that this is Ali's first and only negative interaction with the criminal legal system. Ali has otherwise lived an entirely benign and law-abiding life.

And to be clear, a probated sentence *is* punishment. This case does not go away at sentencing. Instead, Ali has to live with the fact that, for whatever period of time this

court proscribes, Ali has everything to lose by not being complaint with every condition of his release. He cannot drink alcohol or use drugs. He cannot afford to have another "off day" or get leniency for otherwise aberrant behavior. He will have to do his best, every day, or come back and face years in prison. Since his placement on bond, he has been motivated to be the best version of himself. Placing him on bond only encourages the positive behavior that the Court has seen as a result.

To add, there is little worse than the collateral consequences alluded to below. Ali has to live with an assault conviction on his record. Ali has to live with the fact that he has upended and derailed his kids' timeline for coming to the United States. And because of Ali's actions, he will have to live with the stigma of being a felon for the rest of his life. This all is punishment enough.

### f. Ali is adequately deterred from criminal conduct in the future.

General deterrence "occurs when the decision maker contemplates the punishment experiences of others."[6] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already recognized by the decision maker seem sufficiently 'costly' to deter behavior."[7]

---

[6] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence*, 39 CRIMINOLOGY 865, 867 (2001).
[7] *Id.*

Research shows that the "conforming influence" of extralegal consequences attendant to indictment and prosecution (shame, fear of peer disapproval, embarrassment, and social stigma) are far more effective than actual punishment in fostering general deterrence.[8] Even the Department of Justice recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[9] What this means is that the real fear of being caught, the shame of admitting guilt, and the social stigma of prosecution, are all the preventative aspects of deterrence. Not what happens to a stranger who is caught and subsequently punished.[10]

With that framework in mind, a probated sentence provides general and specific deterrence. Any person that learns of Ali's case will learn that a reckless decision to overindulge at the airport carries serious consequences. Ali now has a misdemeanor conviction for assault on his record as a result of this offense. That will never go away, never be expunged. He now has a federal felony conviction to add, exposing to all the stigma and collateral consequences that follow. And for the next several years, he will have federal prison time hanging over his head, and he will have to wake up each

---

[8]     *Id.* at 869.

[9]     NAT'L INSTITUTE OF JUSTICE, *Five Things About Deterrence* (Jun. 5, 2016), *available at*  https://nij.ojp.gov/topics/articles/five-things-about-deterrence  (last accessed October 23, 2025).

[10]     Valerie Wright, Ph.D.: *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,* THE SENTENCING PROJECT (Nov. 2010), *available at*  http://www.antoniocasella.eu/nume/Wright_2010.pdf. (Last accessed on October 23, 2025)

morning knowing that he cannot afford to make the same thoughtless decision. Ali, who is already overwhelmed with guilt and shame about how his conduct has affected his family, is already deterred from engaging in conduct like this ever again.

### g. Ali's need for medical treatment is best addressed in the community.

This Court should give heavy consideration to Ali's serious medical conditions. He has battled chronic kidney disease for 10 years. It is not some medical issue he has ignored and is raising as a concern now; no, he has been actively addressing and receiving comprehensive treatment for nearly a decade. And still, it appears to be a losing battle, but one he is managing with the help of a regular provider in the community. There is no cure, and he is likely to require daily dialysis in short order. And the secondary symptoms include risk that he could lose his toe to gout. He has a treatment plan in place. He has a physician with whom he has a strong relationship. His health is best served by allowing him to continue receiving treatment through his provider, rather than by burdening the overworked and understaffed BOP to care for and properly manage Ali's symptoms.

The BOP's record for caring for the sick has been called into serious question as recently as January 6, 2026, when the Department of Justice Office of Inspector General released a report investigating the tragic death of Fredrick Bardell. The report was made at the instruction of Senior U.S. District Judge Roy B. Dalton, Jr., who had just ordered for Bardell's release on compassionate release prior to Bardell's death. The

report was shocking:

> The hastiness of the BOP's handling of Bardell's release was extremely concerning, because the BOP did not take measures to ensure his safe and compassionate transport in light of his medical condition. Rather, the BOP asked Bardell's parents to book a commercial flight for Bardell and arranged for an inmate to transport him to the airport. Although Bardell required a wheelchair to be taken to Receiving and Discharge for his release from FCI Seagoville, the inmate dropped Bardell off at the curb at the local airport without a wheelchair, and he had to navigate his way to his flight there as well as to a connecting flight in Atlanta, Georgia. By the time Bardell arrived at his destination in Florida, his clothes were soiled with excrement and blood due to his illness and he had to be pushed off the plane in a wheelchair by a fellow passenger. He died 9 days later.

Due to the advanced stage of Ali's chronic kidney disease, he will likely be sent to a facility like FMC Butner, a fact that does not inspire hope. Reporting from National Public Radio (NPR) in 2023 determined that at least 4,950 people have died in federal custody over the last decade or so and that one-fourth of those deaths occurred at one prison: FMC Butner.[11] While an increased number of deaths should be expected at a prison hospital like Butner, NPR's investigation also revealed "numerous accounts of [people] nationwide going without needed medical care," including some who waited months or years for treatment in the face of obvious symptoms of illness.[12]

Whether due to a lack of staffing, a lack of care, or lack of due diligence, the

---

[11] Meg Anderson, *1 in 4 Inmate Deaths Happens in the Same Federal Prison. Why?,* NAT'L PUB. RADIO (Sept. 23, 2023, 6:00 AM), https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates (detailing an investigation that found that "federal prisons fail to treat serious illnesses fast enough").
[12] *Id.*

15

BOP's system of medical care has been failing to provide comprehensive and adequate treatment to incarcerated people for decades.[13] And decade after decade, the federal government's internal oversight mechanisms—the GAO and the DOJ's IG—keep issuing report after report raising a common theme: the BOP is unwilling or unable to provide sufficient health care for the people it incarcerates.[14] For Ali, the decision of whether to offer a probated sentence could very well be a decision of life or death in prison.

### III.    Conclusion

Given Ali's personal characteristics, his lack of criminal history, his performance on pretrial release, and given his need for continued medical attention of a serious medical condition, the Guidelines' suggestion of 12-18 months far exceeds what is "sufficient but not greater than necessary" for the purposes of 18 U.S.C. § 3553(a). The Court must look beyond the mechanical calculation of the guidelines and consider Ali as a whole. For the foregoing reasons, the Court should impose a sentence of probation, with conditions that he submits to, participate in, and complete any additional substance

---

[13] See Nicole B. Godfrey, *Decades of Indifference and Failures in Accountability in the Provision of Medical Care in Federal Prisons*, 25 Nev. L.J. 755 (2025), available at https://scholars.law.unlv.edu/cgi/viewcontent.cgi?article=1971&context=nlj (Last accessed on January 14, 2026)

[14] Lawmakers Push for Federal Prison Oversight After Reports of Inadequate Medical Care, NAT'L PUB. RADIO (Dec. 12, 2023, 5:00 AM), https://perma.cc/T7SG-G7G2 (detailing the response from a "committee tasked with overseeing the nation's federal prisons" to NPR reporting "that federal prisoners die from treatable conditions that are not diagnosed or treated in a timely way within the prison system").

abuse counseling as recommended by Probation, refrain from any alcohol use, and that

he also complete 40 hours of community service within the first year of probation.

<div style="margin-left: 40%;">

Respectfully,

s/ Daniel S. Dena
Daniel Sebastian Dena
Counsel for Mohamed Ali
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
T: (313) 980-2328
</div>

Dated: January 14, 2026          E: Daniel_Dena@fd.org